IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| IMAGININGS 3, INC., DBA FLIX CANDY,<br><br>    Plaintiff<br><br>v.<br><br>UNITED STATES OF AMERICA; U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection,<br><br>    Defendants. | No.   25-260 |

# COMPLAINT

    1.    Plaintiff Imaginings 3, Inc., doing business as Flix Candy ("Flix Candy"), is a multi-generational, family-run and woman-owned American company, known for its innovative, playful brands like Warheads and Pop Ups! Lollipops. Although it designs and brands its candy products, the candy itself is predominantly made in foreign markets, and imported into the United States.

    2.    Beginning in February of this year, through a series of executive orders, President Trump invoked the International Emergency Economic Powers Act ("IEEPA") as authority to impose new and substantial tariffs ("IEEPA duties") on goods imported from nearly every foreign country, including countries from which Flix Candy sources its imports. Flix Candy is the importer of record for most of its imported products and is thus responsible for paying tariffs on those products.

    3.    IEEPA does not authorize these tariffs. This Court and the Federal Circuit have already so held. *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

4.    Through this action, Flix Candy asks the Court to hold for it exactly what it and the Federal Circuit already held in *V.O.S. Selections*: that the IEEPA duties imposed by Defendants, and the underlying executive orders that directed them, are unlawful.

5.    The Supreme Court heard oral argument in *V.O.S. Selections* and a companion case arising out of the U.S. District Court for the District of Columbia[1] (collectively, "the lead cases") on November 5, 2025, and is expected to rule imminently.

6.    This separate action is necessary, however, because even if the IEEPA duties and underlying executive orders are finally held unlawful by the Supreme Court, importers that have paid IEEPA duties, including Flix Candy, are not guaranteed a refund for those unlawfully collected tariffs in the absence of their own judgment and judicial relief.

7.    And this action is necessary *now* because the entries for which Flix Candy paid tariffs imposed under authority of IEEPA are scheduled to begin to become liquidated and final as a matter of law by the end of January 2026. Flix Candy seeks relief from the impending final liquidations to ensure that its right to a complete refund is not jeopardized (and to that end intends to file a motion for a preliminary injunction to suspend liquidation).

8.    Accordingly, for itself, Flix Candy seeks (i) a declaration that the executive orders giving rise to the IEEPA duties are unlawful (*ultra vires*); (ii) an injunction preventing Defendants from imposing further duties on it under the executive orders challenged in this lawsuit; and (iii) full refund from Defendants of all IEEPA duties Flix Candy has paid to the United States as a result of the executive orders challenged in this lawsuit, as well as those it will pay until Defendants are ordered to stop, plus interest.

---

[1] *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025).

## PARTIES

9. Plaintiff Imaginings 3, Inc., doing business as Flix Candy, is a privately held corporation, organized under the laws of the state of Illinois and with its principal place of business in Niles, Illinois.

10. Defendant United States of America is the federal government of the United States of America.

11. Defendant United States Customs and Border Protection ("CBP") is a component agency of U.S. Department of Homeland Security headquartered in Washington, D.C. CBP is responsible for border security and collecting tariffs or duties and taxes on goods imported into the United States.

12. Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity.

## JURISDICTION

13. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i) and 28 U.S.C. § 2631(i). *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1334 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

14. The Court has the same powers at law, in equity, and as conferred by statute as a United States District Court. 28 U.S.C. § 1585. In a civil action under 28 U.S.C. § 1581, the Court can enter a money judgment against the United States and can order any other appropriate civil relief, including declaratory judgments, injunctions, orders of remand, and writs of mandamus or prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

15. Flix Candy has standing to bring this lawsuit because it is the importer of record for goods imported into the United States from countries subject to the unlawful IEEPA duties as

implemented and collected by CBP. As a result of the executive orders challenged by this lawsuit, Flix Candy has paid IEEPA duties to the United States, and thus has suffered injury caused by those orders. Declaratory and injunctive relief from this Court would redress those injuries. Flix Candy also faces imminent and irreparable harm because entries for which it paid IEEPA duties are set to start liquidating on or around January 30, 2026. Accordingly, Flix Candy intends to move for a preliminary injunction to suspend liquidation. Preliminary injunctive relief from this Court would prevent that imminent irreparable harm.

## GENERAL PLEADINGS

### I. President Trump orders a series of tariffs, invoking IEEPA for his authority.

#### A. The IEEPA duties

16. On February 1, 2025, President Trump issued three executive orders imposing tariffs on imports from Canada, Mexico, and China. Each executive order was premised on IEEPA authorizing the tariffs, and for each set of tariffs President Trump claimed that they were justified under IEEPA because of a purported national emergency. Collectively, these are referred to in this complaint as the "Trafficking Tariff Orders."

17. The executive order directed at Mexico, Executive Order 14194, 90 Fed. Reg. 9,117, *Imposing Duties To Address the Situation at Our Southern Border* ("Mexico Tariff Order"),[2] imposed an additional 25 percent tariff on the import of goods from Mexico. The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and

---

[2] Available at https://www.whitehouse.gov/presidential-actions/2025/02/imposing-duties-to-address-the-situation-at-our-southern-border/.

human traffickers, criminals at large, and illicit drugs." *Id.*

18. The executive order directed at Canada, Executive Order 14193, 90 Fed. Reg. 9,113, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border* ("Canada Tariff Order"),[3] declared an emergency because of opioid trafficking, and also imposed a 25% tariff, with certain exceptions.

19. Finally, the executive order directed at China, Executive Order 14195, 90 Fed. Reg. 9121, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China* ("China Tariff Order"), also declared an emergency because of opioid trafficking, declaring that the "the sustained influx of synthetic opioids" was a national emergency and that "[m]any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce."[4] The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.*

20. The China Tariff Order imposed an additional 10% *ad valorem* tariff on products from China imported into the United States on top of existing duties.

21. Four days later, on February 5, 2025, the President issued another order, Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in*

---

[3] Available at https://www.whitehouse.gov/presidential-actions/2025/02/imposing-duties-to-address-the-flow-of-illicit-drugs-across-our-national-border/.

[4] Available at https://www.whitehouse.gov/presidential-actions/2025/02/imposing-duties-to-address-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/.

*the People's Republic of China*. ("February 5 Amendment").[5]

22.     The next month, on March 3, 2025, the President amended the China Tariff Order again through Executive Order 14228, 90 Fed. Reg. 11,463, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* ("March 3 Amendment").[6] The March 3 Amendment raised the incremental tariffs on imports from China to 20% and justified this increase by claiming that "the PRC has not taken adequate steps to alleviate the illicit drug crisis."

23.     On April 2, 2025, citing trade deficits with our trading partners as its own national emergency, President Trump issued Executive Order 14257, 90 Fed. Reg. 15,041 ("Reciprocal Tariff Order"), *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*.[7] The Reciprocal Tariff Order imposed a 10% baseline tariff on nearly all imports to the United States, effective April 5, and additional "reciprocal" tariffs on 57 countries, effective April 9. *Id*. at Annex I. These higher country-specific tariffs range from 11% to 50%. *Id*.

24.     The Reciprocal Tariff Order asserts that "U.S. trading partners' economic policies … suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." *See* Reciprocal Tariff Order.

25.     On April 8, 2025, the President responded to retaliatory tariffs from China by

---

[5] Available at https://www.whitehouse.gov/presidential-actions/2025/02/amendment-to-duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/.

[6] Available at https://www.whitehouse.gov/presidential-actions/2025/03/further-amendment-to-duties-addressing-the-synthetic-opioid-supply-chain-in-the-peoples-republic-of-china/.

[7] Available at https://www.whitehouse.gov/presidential-actions/2025/04/regulating-imports-with-a-reciprocal-tariff-to-rectify-trade-practices-that-contribute-to-large-and-persistent-annual-united-states-goods-trade-deficits/.

DCACTIVE-84456000.1

raising the reciprocal tariff rate on China by 50 percentage points—from 34% to 84%. Exec. Order No. 14,259, 90 Fed. Reg. 15,509, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*.[8]

26. The next day, the President suspended for 90 days the higher country-specific tariffs on all countries except for China, for which he raised the "reciprocal" tariff again—from 84% to 125%. Exec. Order No. 14,266, 90 Fed. Reg. 15,625 (Apr. 9, 2025), *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*.[9] Meanwhile, the 20% trafficking tariff on imports from China remained in place, such that most imports from China faced a minimum 145% IEEPA tariff.

27. In implementing the IEEPA duties by executive order, the President directed changes to the Harmonized Tariff Schedule of the United States ("HTSUS"), requiring that goods subject to the IEEPA duties be entered under a new tariff codes.

28. On April 14, 2025, several companies filed an action in this Court challenging the legality of these tariff orders. *See V.O.S. Selections, et al. v. Donald J. Trump, et al.*, No. 25-cv-00066 (Dkt. 2). As explained below, this Court held the orders were unlawful and the Federal Circuit, sitting *en banc*, affirmed.

29. In the months since the *V.O.S. Selections* complaint was filed, President Trump, invoking IEEPA, has issued additional executive orders imposing additional tariffs and modifying others. As explained below, IEEPA does not authorize the President to impose tariffs. By this complaint, however, Flix Candy challenges only those orders which (i) the Federal

---

[8] Available at https://www.whitehouse.gov/presidential-actions/2025/04/amendment-to-reciprocol-tariffs-and-updated-duties-as-applied-to-low-value-imports-from-the-peoples-republic-of-china/.

[9] Available at https://www.whitehouse.gov/presidential-actions/2025/04/modifying-reciprocal-tariff-rates-to-reflect-trading-partner-retaliation-and-alignment/.

Circuit has already held to be unlawful, *and* (ii) affect the duty rates on goods imported from the countries with which Flix Candy does business and for which Flix Candy pays duties (thus causing Flix Candy injury) (the "Challenged Tariff Orders"), to wit, the China Tariff Order (Executive Order No. 14195, Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China, 90 Fed. Reg. 9,121 (Feb. 1, 2025)), and the Reciprocal Tariff Order (Executive Order No. 14257, Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits, 90 Fed. Reg. 15,041 (Apr. 2, 2025)).

### B.   CBP's implementation of the unlawful tariffs

30.   CBP is charged with the assessment and collection of duties, including the IEEPA duties. *See* 19 U.S.C. §§ 1500, 1502.

31.   In 1988, Congress enacted the Omnibus Trade and Competitiveness Act of 1988, which adopted the new tariff nomenclature: the Harmonized Tariff Schedule of the United States, or HTSUS.  Pub. L. No. 100–418, 102 Stat. 1107 (1988). CBP classifies merchandise imported into the United States consistent with the HTSUS, which sets out the tariff rates and statistical categories using a series of nested chapters, headings, and subheadings. 19 U.S.C. § 1202. The primary headings of the HTSUS describe broad categories of merchandise, while its subheadings provide a particularized division of the goods within each category.  *Id*.

32.   CBP's regulations govern the classification and appraisement of merchandise, consistent with the HTSUS. 19 C.F.R. § 152.11. ("Merchandise shall be classified in accordance with the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202) as interpreted by administrative and judicial rulings.").

33.   The United States International Trade Commission ("USITC") publishes and maintains the HTSUS consistent with presidential orders. 19 U.S.C. §§ 1202, 3005, 3006; *see*

DCACTIVE-84456000.1

*also Michael Simon Design, Inc. v. United States*, 33 C.I.T. 1003, 1010 (2009) ("The authority to modify the HTSUS lies with the President"); *Maple Leaf Marketing, Inc. v. United States*, 582 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

34. When goods enter the United States, CBP is responsible for assessing and collecting any tariffs on those goods, after confirming the HTSUS classification of the goods, according to the rates established by the HTSUS. 19 U.S.C. §§ 1202, 1500, 1502.

### C. Liquidation

35. "'Liquidation' means the final computation or ascertainment of duties on entries for consumption or drawback entries." 19 C.F.R. § 159.1.

36. Typically, when goods enter (*i.e.*, are imported into) the United States, the importer of record pays an estimated duty on the *entry* based on its customs declaration, which asserts a value, origin and HTSUS classification for the imported goods. *See* 9 U.S. C. § 1484. CBP then reviews the customs declaration and may inspect the goods.

37. CBP then fix[es] the final appraisement of merchandise by confirming the final value, classification, duty rate, and final amount of duty for the imported goods. *See* 19 U.S.C. § 1500.

38. Once the final amount of duty is determined by CBP, CBP "liquidates" the entry and notifies the importer of record as to whether they owe more money or are entitled to a refund. *See* 19 U.S.C. § 1504(b).

39. Liquidation—unless extended—must happen within one year. *See* 19 U.S.C. § 1504(a). Typically, liquidation is done automatically by operation of law. CBP tries to liquidate duties 314 days after the date of entry of the goods and will usually post a notice on its website.

40. CBP has discretion to extend the deadline for liquidation for up to one year pursuant to an importer's request and a showing of good cause. *See* 19 U.S.C. § 1504(b)(2); 19

DCACTIVE-84456000.1

C.F.R. § 159.12(a)(1)(ii).

41.     This Court possesses the equitable authority to suspend liquidation. *E.g.*, *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365-66 (Ct. Int'l Trade 2021).

42.     Once liquidation has occurred, and *if* the liquidation is protestable, an importer of record has 180 days to file a protest contesting the liquidation, asking the CBP to "reliquidate" the duties. *See* 19 U.S.C. § 1514.[10] But not all liquidations are protestable: where CBP acts in a ministerial capacity (*i.e.*, without discretion) in imposing a duty, the entry's liquidation cannot be protested. *Id.*; *see also Rimco Inc. v. United States*, 98 F.4th 1046, 1053 (Fed. Cir. 2024).

43.     This Court and the Federal Circuit have cautioned that an importer may lack the legal right to recover refunds of duties for entries that have liquidated, even where the underlying legality of a tariff is later found to be unlawful. *See In re Section 301 Cases*, 524 F. Supp. 3d at 1365-66; *Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025).

**II.     IEEPA does not authorize tariffs.**

44.     The Challenged Tariff Orders cite IEEPA, 50 U.S.C. § 1701 *et seq.*, the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and 3 U.S.C. § 301 for authority to impose tariffs.

45.     None of these statutes authorizes the President to impose tariffs. Of these, it is IEEPA alone that the President and CBP are leaning on to impose and collect the IEEPA duties. IEEPA does not authorize what the Challenged Tariff Orders seek to impose.

46.     IEEPA grants the President certain powers, but they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50

---

[10] CBP can also voluntarily reliquidate within 90 days of the liquidation. *See* 19 U.S.C. § 1501.

U.S.C. § 1701(b).

47. Those powers include the ability to "investigate, regulate, or prohibit" certain transactions in foreign exchange, payments through banks involving foreign countries or nationals, or imports of "currency or securities." 50 U.S.C. § 1702 (a)(1)(A).

48. The President may also control, block, or prohibit the movement or importation of funds or property in which "any foreign country" or foreign national has "interest" in, and which is also subject to the U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(B).

49. Finally, and only when the U.S. is engaged in "armed hostilities" or has been attacked by a foreign country, the President may "confiscate" property of such a foreign person or country that also is subject to U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(C).

50. The text of IEEPA does not use the word "tariff" or any term of equivalent meaning.

51. IEEPA was first enacted in 1977 and has been amended several times, but it has never been amended to authorize, or used by any other President to impose, tariffs.

### A. The U.S. Constitution vests in Congress—not the President—the power to impose tariffs.

52. The United States Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1.

53. The United States Constitution also provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises…" U.S. CONST. art. I, § 8, cl. 3 ("Taxing Clause"), and "[t]o regulate Commerce with foreign Nations." Id., cl. 3 ("Commerce Clause").

54. It has always been understood that tariffs fall within the Taxing and Commerce Clauses.

55. To the extent it is ever permissible under the U.S. Constitution for Congress to

delegate any part of the powers vested in it by the Constitution to the President, it must do so, at a minimum, by providing an intelligible principle to direct and cabin the President's authority. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025). In IEEPA, Congress did no such thing. And there is no better evidence of Congress doing no such thing than the pell-mell manner by which these on-again/off-again IEEPA duties have been threatened, modified, suspended, and re-imposed, with the markets gyrating in response.

56. Reading IEEPA as authorizing tariffs would be self-defeating because it would then also require striking down IEEPA as unconstitutional under the nondelegation doctrine for lack of any intelligible principle.

57. Moreover, "[c]ourts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (*quoting Utility Air Regulatory Group v. EPA*, 573 U. S. 302, 324 (2014)). When Congress has not clearly spoken, courts are directed to find that matters "of vast economic and political significance" are beyond the power of the President. *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023).

58. By any objective measure, the Challenged Tariff Orders are "of vast economic and political significance." Because IEEPA does not clearly authorize the President to set tariffs—indeed, the statute does not mention the words "tariff" or "duty" and is not even housed in the same title of the U.S. Code as Congress's actual trade laws (Title 19)—the Challenged Tariff Orders cannot stand and the CBP is not authorized to implement and collect them.

      **B.**    **Courts, including this Court, have agreed the IEEPA duties are not authorized.**

59. On May 28, 2025, a three-judge panel of this Court granted summary judgment to the plaintiffs in *V.O.S. Selections* and permanently enjoined the government from enforcing the

IEEPA duties at issue in that case. That decision was appealed to the Court of Appeals for the Federal Circuit.

60. The Federal Circuit stayed this Court's decision and injunction and ordered an expedited briefing schedule and hearing.

61. Sitting *en banc*, the Federal Circuit issued its decision on August 29, 2025, affirming this Court's decision that the IEEPA duties are unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

62. In a separate lawsuit filed by a separate group of importers, the U.S. District Court for the District of Columbia held that IEEPA does not authorize tariffs of any sort. *See Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025). That decision was appealed to the Court of Appeals for the D.C. Circuit, but before the D.C. Circuit held argument, the United States Supreme Court granted certiorari in both *V.O.S. Selections* and *Learning Resources*. The cases were consolidated and the Court heard argument on November 5, 2025. A decision is expected imminently.

### III. Flix Candy paid preliminary IEEPA duties

63. As of the date of this complaint, Flix Candy has paid IEEPA duties imposed by the Challenged Tariff Orders.

64. Flix Candy's imports subject to IEEPA duties entered the United States from foreign countries under new HTS codes.

65. Flix Candy has paid IEEPA duties on a continuous basis.

66. The entries for which Flix Candy has paid IEEPA duties imposed by the Challenged Tariff Orders will begin to liquidate on or around January 30, 2026.

67. On October 29, 2025, Flix Candy submitted a letter to CBP requesting it extend liquidation of the entries for which it has paid IEEPA duties directed by the Challenged Tariff Orders. That request was denied by CBP the following day.

## STATEMENT OF CLAIMS

## COUNT I
## THE CHALLENGED TARIFF ORDERS ARE *ULTRA VIRES*.

68. Flix Candy incorporates paragraphs 1-67 by reference.

69. A President may act based on authority inherent in Article II of the U.S. Constitution or an act of Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, (1952) ("The President's power, if any, to issue the order must stem either from an act of Congress or from the Constitution itself."); *see also id.* at 587-88 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker . . . . The Founders of this Nation entrusted the lawmaking power to the Congress alone in both good and bad times."); *see also id.* at 655 (Jackson, J., concurring) ("The Executive, except for recommendation and veto, has no legislative power.").

70. The Congress, not the President, is vested by the U.S. Constitution with the power to set tariffs. *See* U.S. Const. art. I, § 8, cl.1.

71. Thus, if a President is ever to have any authority to set a tariff, that authority must be found in an act of Congress. The tariff authority asserted in the Challenged Tariff Orders is based entirely on IEEPA. Yet there is nothing in the text of IEEPA that demonstrates Congress did, or even tried to, delegate any such authority to the President. The meaning of IEEPA presents a question of statutory interpretation on which the executive branch is not entitled to deference. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024). Nor would it be

-14-

entitled even to limited "respect" because, before the Challenged Tariff Orders, no President in the history of IEEPA had invoked it as authority to set tariffs. *Id.* at 403. And the question is made even easier by the fact that the Challenged Tariff Orders pose issues of "vast economic and political significance," indeed of unprecedented significance. *See Biden v. Nebraska*, 600 U.S. 477, 501 (2023); *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 716 (2022); *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021). One would expect, at the very least, a clear statement in IEEPA that the President is authorized to do what the Challenged Tariff Orders purport to do before construing IEEPA in that manner. *W. Virginia v. Env't Prot. Agency*, 597 U.S. at 716.

72. Flix Candy is an importer of record and has suffered injury by having been required to pay IEEPA duties as a result of the Challenged Tariff Orders on goods it has imported into the United States. Because neither the Constitution nor IEEPA authorizes the tariffs established by the Challenged Tariff Orders, those tariffs are *ultra vires* and must be declared unlawful and void *ab initio* as to Flix Candy. *Accord V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

**COUNT II (IN THE ALTERNATIVE)**
**IF IEEPA IS CONSTRUED TO AUTHORIZE TARIFFS, IT IS UNCONSTITUTIONAL.**

73. Flix Candy incorporates paragraphs 1-67 by reference.

74. The Constitution vests "[a]ll legislative Powers" in "Congress." U.S. CONST. art. I, § 1. This includes the power to "lay and collect . . . Duties." *Id.* art. 1, § 8, cl. 1. Congress "is not permitted to abdicate or to transfer to others the essential legislative functions with which it is . . . vested," whether that function is the imposition of tariffs or revenue raising. *A.L.A.*

DCACTIVE-84456000.1

*Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *see Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 42-43 (1825).

75. To the extent that IEEPA is construed by this Court so broadly as to permit the President to impose the tariffs set forth in the Challenged Tariff Orders it violates Article I of the Constitution and the separation of powers.

76. While under first principles of separation of powers the Congress may not delegate any power *vested* in it by Article I of the Constitution, to the extent it tries to delegate some ministerial aspect of its power to the President it must, at the very least, lay down "an intelligible principle" to cabin the agency's discretion. *Gundy v. United States*, 588 U.S. 128, 135 (2019) (alteration in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)); *see also Fed. Commerce Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482 (2025). IEEPA does not lay down any such intelligible principle to constrain the President's authority to set tariffs.

77. Flix Candy is an importer of record and has suffered injury by having been required to pay IEEPA duties as a result of the Challenged Tariff Orders on goods it has imported into the United States. Because IEEPA, if construed to authorize the tariffs established by Challenged Tariff Orders, is unconstitutional, those tariffs must be declared unlawful and void *ab initio* as to Flix Candy.

## COUNT III
### (DECLARATORY RELIEF, 28 U.S.C. § 2201)

78. Flix Candy incorporates the preceding paragraphs by reference.

79. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

80. Flix Candy's claims present an actual controversy as to the President's authority

DCACTIVE-84456000.1

under IEEPA, the constitutionality of IEEPA, and the authority of Defendants to implement and collect the resulting tariffs.

81. Flix Candy is an importer of record and has suffered injury by having been required to pay IEEPA duties as a result of the Challenged Tariff Orders on goods it has imported into the United States.

82. This Court can exercise its equitable power to enter a declaratory judgment that the Challenged Tariff Orders are unlawful for any of the above reasons, and that Defendants lack authority to implement and collect the resulting tariffs, as to Flix Candy.

## PRAYER FOR RELIEF

Flix Candy respectfully requests that this Court:

   a) declare that the President lacks authority under IEEPA to set tariffs;

   b) declare that the China Tariff Order is *ultra vires* or, alternatively, unconstitutional, and on either ground void *ab initio* with respect to Flix Candy;

   c) declare that the Reciprocal Tariff Order is *ultra vires* or, alternatively, unconstitutional, and on either ground void *ab initio* with respect to Flix Candy;

   d) declare that, with respect to Flix Candy, Defendants lack authority to implement and collect any tariffs set out in the HTSUS that are based on the China Tariff Order;

   e) declare that, with respect to Flix Candy, Defendants lack authority to implement and collect any tariffs set out in the HTSUS that are based on the Reciprocal Tariff Order

-17-

f)  with respect to Flix Candy, enjoin Defendants from imposing and enforcing any tariffs set out in the HTSUS that are based on the China Tariff Order;

g)  with respect to Flix Candy, enjoin Defendants from imposing and enforcing any tariffs set out in the HTSUS that are based on the Reciprocal Tariff Order;

h)  order Defendants to refund to Flix Candy the IEEPA duties paid by Flix Candy to the United States as a result of the China Tariff Order, with interest as provided by law;

i)  order Defendants to refund to Flix Candy the IEEPA duties paid by Flix Candy to the United States as a result of the Reciprocal Tariff Order, with interest as provided by law;

j)  award Flix Candy its reasonable costs, including attorneys' fees, incurred in bringing this action; and

k)  grant such further relief as this Court deems proper.

DCACTIVE-84456000.1

|  |  |
|---|---|
|  | Respectfully submitted, |
|  |  |
|  | /s/ Daniel W. Wolff |
| Dated:  November 12, 2025 | John B. Brew |
|  | Daniel W. Wolff |
|  | CROWELL & MORING LLP |
|  | 1001 Pennsylvania Avenue, NW |
|  | Washington, DC 20004 |
|  | Tel. (202) 624-2500 |
|  | JBrew@crowell.com; DWolff@crowell.com |
|  |  |
|  | Joachim Steinberg |
|  | CROWELL & MORING LLP |
|  | 3 Embarcadero Center |
|  | 26th Floor |
|  | San Francisco, CA 94111 |
|  | Tel. (415) 365-7461 |
|  | JSteinberg@crowell.com |
|  |  |
|  | *Counsel for Plaintiff IMAGININGS 3 DBA FLIX CANDY* |

-19-